**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **VICKIE MICHELLE BARTLETT,** | } | |
| | } | |
| **Plaintiff** | } | |
| | } | |
| **v.** | } | **Civil Action No.: 4:14-CV-2005-RDP** |
| | } | |
| **CAROLYN W. COLVIN,** | } | |
| **Acting Commissioner of Social Security** | } | |
| | } | |
| **Defendant.** | } | |

**MEMORANDUM OF DECISION**

Plaintiff, Vickie Bartlett, brings this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). *See also*, 42 U.S.C. §§ 405(g), 1383(c). After reviewing the record and the parties' briefs, the court finds that the Commissioner's decision is due to be affirmed.

**I.    Proceedings Below**

On September 8, 2011, Plaintiff submitted DIB and SSI applications, alleging a period of disability beginning September 8, 2011. (Tr. 20). The Social Security Administration initially denied Plaintiff's applications. (Tr. 20). In response, Plaintiff requested – and, on November 7, 2012, received -- a hearing before Administrative Law Judge George W. Merchant (the "ALJ"). (Tr. 39-68). In his decision, dated December 14, 2012, the ALJ determined that Plaintiff was not disabled under the Act from the alleged onset date, September 8, 2011, through the date of his decision. (Tr. 20-32).

Plaintiff requested that the Appeals Council review the ALJ's decision, and submitted three representative briefs, which included additional evidence dated October 2012 through February 2014.[1] (Tr. 261-63, 264-67, 268-69; 508-14; *see also* Supp. Tr. 519-684).

After considering Plaintiff's arguments and additional evidence, the Appeals Council determined that the evidence dated October 2012 through December 2012 did not provide a basis for changing the ALJ's decision, and that the evidence dated January 2013 through February 2014 did not affect the ALJ's decision, because it did not pertain to the relevant period of alleged disability. (Tr. 2-5). On August 15, 2014, the Appeals Council denied Plaintiff's request, finding that the ALJ applied the proper legal standards and his decision was supported by substantial evidence. (Tr. 1-6). This denial rendered the ALJ's decision the final decision of the Commissioner, and therefore, a proper subject of this court's appellate review. *See* 20 C.F.R. §§ 404.981, 422.210(a).

## II.    Facts

At the time of Plaintiff's ALJ hearing, Plaintiff was 36-years-old with an eighth grade education. (Tr. 44). Plaintiff has worked as a cook helper, a hotel housekeeper, and a cashier. (Tr. 61-65). In her applications for SSI and DIB, Plaintiff alleged a disability onset of September 8, 2011, due to osteoarthritis and low potassium. (Tr. 216). Plaintiff testified that, after her onset date, she continued to work part-time prepping food at Gadsden Country Club until January 2012. (Tr. 44-45) On September 28, 2011, when contacted by a disability specialist, Plaintiff reported that her disabling conditions included osteoarthritis, problems with potassium, and pain in her lower back, hips, shoulders and knees. (Tr. 222). At the hearing, Plaintiff testified that her

---

[1] Additionally, Plaintiff submitted additional documents for review by the Appeals Council. (Pl.'s Am. Mem. at 5). On August 10, 2015, this court granted Plaintiff's Motion to Supplement and Correct the Record, and ordered Plaintiff's mental treatment records from C.E.D. Mental Health Services dated February 5, 2013 through May 14, 2013 be included in the evidence of record. (*See* Pl.'s Mo. to Supp. R., Ex. A).

disabling conditions included severe depression, bi-polar disorder, generalized anxiety disorder, degenerative joint disease, arthritis, levoscoliosis, spondylosis, shoulder and lower-back pain, and headaches.[2] (Tr. 23-24, 43-44, 489). Plaintiff also testified that her back pain and arthritis rendered her unable to stand in place for more than fifteen minutes, and unable to sit for more than ten minutes. (Tr. 26).

Concerning activities of daily living, Plaintiff testified that she spends most of her day on the couch with her feet elevated, watching television, or surfing the internet (Tr. 49). Plaintiff expressed that she was able to care for herself and maintain her own hygiene, but clarified that on occasion she does not bathe, dress herself, leave the household, or remember to eat. (Tr. 46-61). Plaintiff testified that she had joint custody of her eleven-year-old son, she drove him back-and-forth to school daily, she visits the grocery store twice a month, and despite increased pain and discomfort, she shared household chores, including washing dishes and laundry. (*See* Tr. 53, 56, 60; *See also* 462-66). At the time of the hearing, Plaintiff was not being treated by a mental-health specialist, but was taking medication for her depression and anxiety, which was prescribed by her primary-care physician, Dr. Tariq. (*See* Tr. 58, 486-87, 493-504).

Quality of Life Health Services medical records from 2009 reveal that Plaintiff presented to Dr. Tariq complaining of worsening chronic back pain and right shoulder pain. (Tr. 271). Plaintiff reported that she had experienced this pain for six months, but indicated the pain was not a result of trauma. (Tr. 271). An x-ray of Plaintiff's right shoulder showed slight degenerative joint disease but no acute finding, while an x-ray of Plaintiff's lumbar spine showed slight inferior levoscoliosis and mild to moderate spondylosis. (Tr. 275). In response to these findings, Dr. Tariq gave Plaintiff a prescription for Ultram to treat her pain. (Tr. 272). After

---

[2] Plaintiff provided records from Dr. Prince, Plaintiff's examining physician, documenting Plaintiff's October 2011 examination. (Tr. 15F) Dr. Prince diagnosed Plaintiff with chronic-pain syndrome and fibromyalgia; however, the ALJ found these diagnoses were medically non-determinable and non-severe. (Tr. 23, *see* Tr. 488-89)

continued complaints of pain through 2010, Plaintiff was referred to pain management. (Tr. 384). However, unsatisfied with the medications provided by pain management, Plaintiff returned to her treating primary-care physician later that year. (Tr. 391).

In 2010, Plaintiff began seeking psychological therapy and treatment from C.E.D. Mental Health Center. These medical records indicate that Plaintiff was evaluated, the mental health professional ruled out a diagnosis of bipolar disorder, and diagnosed Plaintiff with major depressive disorder. (*See* Tr. 397-410). Further, C.E.D. Mental Health Center treatment notes indicate Plaintiff received Global Assessment of Functioning (GAF) scores of 55 and 53, indicating moderate symptoms. (Tr. 405). Plaintiff testified that she stopped going to C.E.D. Mental Health Center, because she was not pleased with the prescriptions provided, and instead sought her medication from her primary-care physician. (Tr. 48).

Mercy Medical Center records dated November 2011 indicate Plaintiff began seeing Dr. Teschner, another primary-care physician, presenting with complaints of lower-back pain. (*See* Tr. 411-41). To address these complaints Dr. Teschner provided Plaintiff prescriptions for Lortab and Naprosyn. (Tr. 421). In December 2011, magnetic resource imaging (MRI) of Plaintiff's lumbar spine revealed a small L4-5 disc protrusion without focal nerve-root compression, and small bulging discs at L4-S1. (Tr. 485, 470). Plaintiff continued to receive treatment from Dr. Teschner until March 2012, when Plaintiff returned to Quality of Life Health Center due to a lack of health insurance. (Tr. 435). Notably, at the request of (and on forms provided by) Plaintiff's attorney, Dr. Teschner submitted two Disability Questionnaires, one dated April 2012, the other November 2012, which opined that Plaintiff was disabled. (*See* Tr. 475-76, 505-507). Dr. Teschner indicated significant impairments in Plaintiffs physical abilities. (*Id*.).

In March 2012, Plaintiff's attorney referred her to an examining psychologist, Dr. Wilson, for a psychological evaluation. (Tr. 462-66). Dr. Wilson observed that Plaintiff was able to count down from 20, perform serial three's to twenty-seven, and count down from one-hundred in increments of seven until reaching sixty-five. (Tr. 462-66). Dr. Wilson's notes indicate that Plaintiff had good mental control, attention, and concentration. Based on his observations of Plaintiff's intellectual functioning Dr. Wilson diagnosed Plaintiff with low-average to borderline intelligence. (Tr. 465-66). During Dr. Wilson's evaluation, Plaintiff reported experiencing chronic anxiety and fluctuating moods, denied experiencing suicidal ideation, and indicated fair insight and judgment. (Tr. 465). Based on his observations of Plaintiff's mental health, Dr. Wilson assigned Plaintiff a GAF score of 50, indicating serious symptoms, and concluded Plaintiff's depression and anxiety would cause significant problems and present major difficulties in a work environment. (Tr. 466).

In October 2012, Plaintiff was referred by her attorney to Dr. Daniel Prince, an independent medical examiner, for a physical examination. (Tr. 488-89). Dr. Prince's examination notes reveal a reduction in Plaintiff's lumbar flexibility, with unremarkable straight leg testing, and noted the absence of edema or phlebitis on all of Plaintiff's extremities. (Tr. 489). Upon examination, Dr. Prince found indications of fibromyalgia and trigger points in Plaintiffs neck-trapezius, spine, shoulders, elbows, hips, and knees, but found Plaintiff's elbows, wrists, knees, and feet showed no indications of inflammatory synovitis (Tr. 489). Based on observations made during Plaintiff's physical examination, Dr. Prince found Plaintiff had severe fibromyalgia, chronic pain syndrome, and bipolar disorder, and concluded that Plaintiff was chronically and permanently disabled. (Tr. 489).

Plaintiff was transferred to St. Vincent's East on January 13, 2013 after indicating severe depression with suicidal ideation. Plaintiff voluntarily admitted herself to inpatient treatment, and was discharged February 5, 2013. (*See* Supp. Tr. 566-684). Upon intake, and in response to an inquiry by the staff at St. Vincent's East as to how long Plaintiff had been suffering from this particularly severe episode of depression, Plaintiff indicated one month. (Supp. Tr. 669). Plaintiff attributed the deterioration of her mental health to the financial repercussions of her inability to receive disability. (Supp. Tr. 590, 670). Notes taken during Plaintiff's stay at St. Vincent's East indicate that she was no longer living with her brother and his roommate, and her living situation was temporary, at best. (Supp. Tr. 564-67). Further,  St. Vincent's inpatient records also note that Plaintiff reported noncompliance with her prescribed antidepressant treatment, and indicate that once treatment resumed Plaintiff showed enough improvement to be discharged and referred to outpatient therapy. (Supp. Tr. 567). Plaintiff's discharge summary from St. Vincent's states that during her stay Plaintiff was primarily concerned with the receipt of her pain medication, and that despite receiving double her prescribed dosage, Plaintiff continued to complain of unmanageable pain. (Supp. Tr. 567).

Following her February 2013 discharge from St. Vincent's East, Plaintiff received counseling from C.E.D. Mental Health Services from February 2013 to October 2013. (Tr. 539-542, Pl.'s Mo. to Supp. R., Ex. A). Initial records from C.E.D. indicate that Plaintiff's depression continued, but that Plaintiff no longer presented with suicidal ideation, was compliant taking her prescription medications, and noticed improvement in her sleeping patterns. (Pl.'s Mo. to Supp. R., Ex. A 8, 10). C.E.D.'s April 2013 treatment notes describe Plaintiff as presenting with liable mood and unkempt hygiene, with complaints of experiencing mood swings and nighttime depression since her last visit, and reports of perceptual disturbances -- auditory hallucinations --

beginning two days prior. (Pl.'s Mo. to Supp. R., Ex. A 9, 12, 14-18). In May 2013, Plaintiff reported that, although depressed, she had not experienced any more hallucinations. (Pl.'s Mo. to Supp. R., Ex. A 3, 6, 9, 12, 14-18). Treatment notes from August 2013 describe significant improvements in Plaintiff's home life and in her general outlook and disposition. (Supp. Tr. 540). Additionally, during therapy Plaintiff reported that she was, "working on letting go what can't be changed" and staying busy cross-stitching, cleaning, and spending time at church, and that this increase in activity has improved her sleeping patterns. (Supp. Tr. 540-41).

Records from Quality of Life Health Center, dated February 2013 through February 2014, document that Plaintiff presented for a follow-up examination for her depression and back pain. (Supp. Tr. 535-38, 534-55). At her February 2013 follow-up, Plaintiff reported that she was neither depressed nor anxious, was "moderate[ly]" active, and had recently traveled to Florida. (Supp. Tr. 543-44). Examination notes from that time period describe Plaintiff as anxious with signs of anhedonia,,[3] but oriented to time, place, person and situation, and indicate Plaintiff had a muscle spasm in her lumbar spine which "mildly reduced" her range of motion. (Supp. Tr. 545). And, April 2013 examination records indicated no physiological problems and described Plaintiff as appropriately oriented, with an in-tact memory. (Supp. Tr. 549). Similarly, July 2013 records and February 2014 records report largely the same findings. (Supp. Tr. 537, 549, 554). Those records also noted that Plaintiff was anxious, suffered from anhedonia, and had a muscle spasm in Plaintiff's lumbar spine.

## III.    The ALJ's Decision

To qualify for disability benefits under the Act, a claimant must show "the inability to

---

[3] Anhedonia, a symptom commonly associated with depression, is the clinical term for an individual's loss of interest in previously rewarding or enjoyable activities. *See generally* William James, *The Varieties of Religious Experiences: A Study in Human Nature* 109 (LeRoy L. Miller ed. & ann., Longmans, Green and Co. 1907)(*citing* Théodule Aramand Ribot, *La Psychologies des Sentiments* (Félix Alcan ed., Paris 1896)).

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). The ALJ must apply a five step analysis when determining disability under the Act. *See* 20 C.F.R. §§ 404.1520 (a)-(g), 416.920 (a)-(g); *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

In the first step, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity" is work activity that requires significant physical or mental activities. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit." § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then a claimant cannot claim disability. In the second step, the ALJ must determine whether a claimant has a medically determinable impairment or a combination of medical impairments that significantly limit a claimant's ability to perform basic work activities. § 404.1520(a)(4)(ii). Absent such impairment or combination thereof, a claimant may not claim disability. *Id.* In the third step, the ALJ must determine whether a claimant's impairment meets or medically equals the criteria of an impairment listed in the federal regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1; 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. If the Listing requirements are met, then a claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the disability requirements of the third step are not satisfied, the ALJ may still find disability under the next two steps of the analysis. However, before proceeding to the fourth step the ALJ must first determine a claimant's residual functional capacity ("RFC") or a claimant's

ability to work in spite of a claimant's impairments. § 404.1520(e). In the fourth step, the ALJ must determine whether a claimant has the RFC to perform past relevant work. Section 404.1520(a)(4)(iv). If the ALJ finds that a claimant is capable of performing past relevant work, then a claimant cannot be declared disabled under the Act; but, if the ALJ finds a claimant unable to perform past relevant work, then the analysis proceeds to the fifth, and final, step of analysis. § 404.1520(a)(4)(v). The fifth step of analysis requires the ALJ to determine whether a claimant is able to perform any work, present in the national economy commensurate with a claimant's RFC, age, education, and work experience. *See* §§ 404.1512(g), 404.1520(g), 404.1560(c). Here, the burden of proof shifts from a claimant to the Commissioner to prove the existence, in significant numbers, of jobs within the national economy that a claimant can do given her RFC, age, education, and work experience. *See* §§ 404.1520(g), 404.1520(c); *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).

Here**,** the ALJ considered the entire record, as it existed at that time, and found that Plaintiff met the insured status requirements of the Act through December 31, 2016, and that Plaintiff had not engaged in substantial gainful activity after the alleged disability onset.[4] (Tr. 22). Next, the ALJ found that Plaintiff has severe, medically-determinable impairments of right shoulder degenerative joint disease, lumbar degenerative disc disease, depression, anxiety, and low average intellectual functioning. (Tr. 23) *See* §§ 404.1520(c) and 416.920(c). The ALJ also considered Plaintiff's alleged migraine headaches, fibromyalgia, bipolar disorder, and chronic pain syndrome. (Tr. 23-24). Regarding Plaintiff's alleged migraine headaches, the ALJ noted that the medical evidence of record provided no proof of treatment or diagnosis, and as a result found Plaintiff's alleged migraine headaches were not medically-determinable. (Tr. 23, 411-41, 467-

---

[4] The ALJ noted that Plaintiff's part-time work in the prep-kitchen at the Gadsden Country Club between January 2011 and January 2012 did not rise to the level of substantial gainful activity. (Tr. 22).

72). With respect to Plaintiff's alleged fibromyalgia, the ALJ acknowledged that upon her attorney's directive, Plaintiff presented to Dr. Prince, with complaints of all over pain. (Tr. 23, 488-89). On examination, Dr. Prince diagnosed Plaintiff with fibromyalgia syndrome, opining that she had trigger points in her neck, trapezius, spine, shoulders, elbows, hips, and knees. (Tr. 23, 488-89). However, under the guidance of Social Security Ruling 12-2p, the ALJ observed that Dr. Prince's examination notes failed to indicate how many trigger points were identified, and that other disorders were considered and excluded prior to the diagnosis. *See* SSR 12-2p, 2012 WL 310869 (July 25, 2012) (requiring a history of widespread pain, at least 11 positive tender points on physical examination, and evidence that other disorders were considered and excluded before an alleged impairment may rise to the level of a medically-determinable impairment). (Tr. 23). As a result the ALJ found that Plaintiff's fibromyalgia was not medically-determinable.[5] (Tr. 23). Turning to Plaintiff's diagnoses of bipolar disorder and chronic pain syndrome, the ALJ observed that these diagnoses were made by a non-specialist, who only conducted a physical examination. (Tr. 23, 488-89). The ALJ found that these alleged impairments were not medically-determinable, after identifying that, during the relevant time period, Plaintiff sought mental health treatment, but received neither a diagnosis of, nor treatment for bipolar disorder or chronic pain syndrome. (Tr. 24).

Next, the ALJ found that Plaintiff's impairments, taken singly or in combination, neither met, nor medically-equaled, Listings 1.02, 1.04, 12.02, 12.04, or 12.06, as defined under the Listings of Impairments. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1. (Tr. 24). In making this decision, the ALJ took into consideration the evidence of record, and Plaintiff's subjective

---

[5] Although finding Plaintiff's alleged fibromyalgia was not medically-determinable, the ALJ observed that "any limitations caused by [Plaintiff's] alleged all over pain are captured by the limits from the [previously] identified musculoskeletal problems that are severe impairments." (Tr. 23).

symptomology. (*See* Tr. 24). Despite Plaintiff's contention that she met the criteria of Listing 12.04, the ALJ found that "the medical evidence of record does not contain any diagnostic findings, signs, symptoms, or laboratory results that meet any of the listed impairments." (Tr. 24). The ALJ considered the "Paragraph B" criteria of Listings 12.02, 12.04, and 12.06, which require the mental impairments result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Tr. 24). *See Id.* The ALJ determined that the "Paragraph B" criteria of Listings 12.04 and 12.06 were not satisfied, because Plaintiff had no more than moderate difficulties in the above categories, and no episodes of decompensation. (Tr. 24-25). The ALJ also considered the "Paragraph C" criteria.[6] (Tr. 25). For many of the same reasons, the ALJ found that Plaintiff failed to present evidence establishing the presence of "Paragraph C" criteria. (Tr. 25). *See id.*

The ALJ completed an RFC assessment before proceeding to the fourth step of his analysis. (Tr. 26). In doing so, the ALJ found that, although Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not wholly credible. (Tr. 26). The ALJ noted that Plaintiff's medical treatment for the allegedly disabling physical impairments was "essentially routine and conservative in nature," and was not the type of medical treatment expected for a totally disabled individual. (Tr. 28). Additionally, the ALJ

---

[6] The "Paragraph C" criteria is to be used when there is a medically documented history of a chronic organic mental disorder, schizophrenia, some other paranoid or psychotic disorder, or an affective disorder. In order to satisfy this portion of the listing, the disorder must be of at least two years duration with symptoms or signs currently attenuated by medication or psychological support, and must cause more than a minimal limitation in ability to do basic work activities. Additionally, there must be a history of repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. Pt. 404, Supt. P, App'x 1.

expressed skepticism regarding Plaintiff's compliance with her prescription medication, referencing occasions where Plaintiff tested positive for un-prescribed pain medication, including oxymorphone, methadone, alprazolam, and oxazepam. (Tr. 27, 435). The ALJ pointed to several inconsistencies within Plaintiff's own testimony regarding her daily activities, and reasoned that Plaintiff's description of her daily activities did not support a finding of complete disability. (*See* Tr. 29; 56-59, 465).

The ALJ then considered and assigned little weight to the opinion of Plaintiff's examining psychologist, Dr. Wilson, which indicated that Plaintiff suffered from severe depression and anxiety. In rejecting Dr. Wilson's opinion, the ALJ noted that moderate symptoms, as represented by Plaintiff's previous GAF scores of 53 and 55, were consistent with her treatment records, and supported by Plaintiff's use of a primary care physician to treat her depression. [7] (Tr. 29, 58-59, 237, 404, 406, 408, 462). The ALJ emphasized that Plaintiff underwent the examination, which "formed the basis of the opinion in question, not in an attempt to seek treatment for symptoms, but rather, though attorney referral and in connection with an effort to generate evidence for the current appeal." (Tr. 29, 473-74).

The ALJ also assigned little weight to the opinions of Plaintiff's treating physician, Dr. Teschner. (Tr. 29, 475-76, 505-507). The ALJ found Dr. Teschner's opinions were conclusory and "wildly inconsistent with her limited outpatient treatment notes, the diagnostic imaging she ordered, and [Plaintiff's] purported daily activities." (Tr. 29, 475-76, 505-507). Additionally, the ALJ explained that he assigned little weight to the opinions of Dr. Daniel Prince, finding them inconsistent with the treating mental health and physical treatment records, and outside of Dr.

---

[7] In his decision, the ALJ mistakenly stated that a GAF score of 50 represented moderate symptoms. (*See* Tr. 28). The court recognizes that a GAF score of 50 is at the top of the range for serious symptoms. *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 34 (4th ed. 2000). But, for reasons discussed in Part VI *infra*, the court finds that this misstatement amounts to harmless error.

Prince's area of medical expertise. (Tr. 30, 488-92). As with the opinions of Dr. Wilson, the ALJ emphasized that Plaintiff underwent the examination, which formed the basis of Dr. Prince's opinion, "not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal." (Tr. 30).

For these reasons, the ALJ determined, that notwithstanding Plaintiff's medically-determinable impairments, the objective evidence on record showed that Plaintiff had the RFC to perform light work, where Plaintiff may climb ramps and stairs, balance, stoop, kneel, crouch and crawl only occasionally, but should not climb ladders, ropes, or scaffolds, and should avoid all exposure to hazardous, moving machinery and unprotected heights. *See* 20 C.F.R. §§ 404.1567(b) and 416.967(b). (Tr. 26). With respect to Plaintiff's mental and social limitations, the ALJ determined that Plaintiff had the RFC to carry out simple, but not detailed or complex instructions, for two hours at a time with normal breaks during a workday, in a low stress environment with no more than occasional changes and occasional decision-making required, and with only occasional interaction with the public. *See* 20 C.F.R. §§ 404.1567(b) and 416.967(b). (Tr. 26).

Relying on the Vocational Expert's testimony, the ALJ then determined that Plaintiff's RFC prevents her from performing any of her past relevant work as a housekeeper, cashier, and cook's helper. (Tr. 30). However, while taking into account limitations noted above, the ALJ concluded that Plaintiff is capable of making a successful adjustment to other work which exists in significant numbers in the national economy. Accordingly, the ALJ found Plaintiff is not disabled, within the meaning of the Act, and is ineligible for both disability insurance benefits and social security income from September 8, 2011, through the date of his decision. (Tr. 32).

## IV.   Plaintiff's Argument for Reversal or Remand

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the denial of review by the Appeals Council, reversed, or in the alternative, remanded for further consideration. (*See* Pl.'s Am. Mem. 2, 21-37; *see also* Pl.'s Mo. for Remand at 1). Plaintiff presents several arguments in support of her appeal: (1) the ALJ misstated the significance of Plaintiff's GAF score of 50; (2) the Appeals Council failed to articulate an adequate rationale when refusing to consider new evidence; (3) the ALJ's decision is not supported by substantial evidence, particularly when evidence submitted to the Appeals Council is considered; (4) the ALJ's finding of Plaintiff's RFC is not supported by substantial evidence; (5) the ALJ failed to give appropriate weight to the opinion of Plaintiff's examining psychologist, Dr. Wilson, but rather substituted his own opinion for Dr. Wilson's. (*See* Pl.'s Am. Mem. 2, 21-37; *see also* Pl.'s Mo. for Remand 1-8). The court addresses each of these arguments below.

## V.   Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, and whether the correct legal standards were applied. *See* 42 U.S.C. § 405(g); *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982). The Commissioner's findings are conclusive if supported by "substantial evidence." 42 U.S.C. § 405(g); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not reconsider the facts, reevaluate the evidence, nor substitute its judgment for that of the Commissioner. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Instead, the court must review the final decision as a whole, and determine whether the decision is "reasonable and supported by substantial evidence." *See id.* Substantial evidence falls

somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239). When substantial evidence exists in support of the Commissioner's decision, his decision must be affirmed, even if the evidence preponderates to the contrary. *See id*. While the court acknowledges the limited scope of judicial review, the court notes that the review "does not yield automatic affirmance" of the ALJ's decision. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988). Unlike questions as to the factual findings, questions of legal standards are to be reviewed by the court *de novo*. *Moore v. Barnhart*, 405 F.3d 1208, 1211(11th Cir. 2005).

In accordance with the Act's mandate, the only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, and whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982).

## VI.    Discussion

After careful review, and in light of the legal standards that apply in this case, the court rejects Plaintiff's arguments for remand or reversal. Plaintiff has failed to meet her burden by proving she was disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(H)(I); 20 C.F.R. §§ 404.1512(a), (c); *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). Disability is defined as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment[,] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§423(d)(1)(A). For the reasons outlined below, the court finds that the ALJ relied on substantial evidence and applied the proper legal standards.

A.     **The Evidence Plaintiff Submitted to the Appeals Council Does Not Warrant Remand**

Plaintiff asserts that the Appeals Council refused to consider Plaintiff's newly submitted medical records *solely* because the records were dated after the ALJ denial. (*See* Pl.'s Am. Mem. 23)(emphasis in original). This argument fails. The Appeals Council adequately articulated that it had evaluated the new evidence, and properly found the new evidence did not warrant a remand to the ALJ for further consideration.

When a claimant properly presents new evidence to the Appeals Council, the reviewing court typically must consider whether the new evidence renders the denial of benefits erroneous. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007). But the Appeals Council must review new evidence only if it is both material and relates to the period on or before the date of the ALJ's hearing decision. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994); 20 C.F.R. § 404.970(b). Even in light of new evidence, the Appeals Council may deny review if the record shows no error in the ALJ's decision. *See Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 784-85 (11th Cir. 2014)(affirming where the Appeals Council accepted new evidence, but "denied review because the additional evidence failed to establish error in the ALJ's decision."). When the Appeals Council determines that the evidence does not render the ALJ's decision to deny benefits erroneous, the Appeals Council must show in its written decision that it has adequately evaluated the evidence. *Flowers v. Comm'r of Soc. Sec.*, 441 F. App'x 735, 745 (11th Cir. 2011). For the reasons explained below, the court concludes that the Appeals Council's written denial reflects an adequate evaluation of

Plaintiff's new evidence and a proper determination that Plaintiff's additional evidence was chronologically-irrelevant, immaterial, and/or cumulative.

Here, after reviewing Plaintiff's newly submitted evidence, the Appeals Council incorporated Plaintiff's October 2012 mental health center notes and December 2012 records from Quality of Life Health Services into the record. (Tr. 5, 508-18). Also, the Appeals Council considered the following newly submitted evidence: records received from (1) St. Vincent's East dated January 13, 2013 through February 5, 2013; (2) C.E.D. Mental Health Services dated February 7, 2013 through October 3, 2013; and (3) Quality of Life Health Center dated February 4, 2013 through February 6, 2014. (Tr. 6; Supp. Tr. 535-42, 543-55, 556-684; *see also* Pl's M. to Supp. R., Ex. A). After considering the newly submitted evidence and analyzing Plaintiff's reasons for disagreeing with the ALJ's decision, the Appeals Council denied Plaintiff's request for review, explaining that neither the new evidence nor Plaintiff's arguments provided a basis for changing the ALJ's decision. (Tr. 5-6). The Appeals Council further explained that the new evidence from St. Vincent's East, C.E.D. Mental Health Services, and Quality of Life Health Center, dated February 4, 2013 through February 6, 2014, concerned a later time period (unrelated to Plaintiff's disability claim in this case), and as such, did not affect the ALJ's decision that Plaintiff was not under a disability during the relevant time frame. (Tr. 6, 32).

Plaintiff's argument that the Appeals Council erroneously refused to consider the additional evidence *solely* because the records reflect a date after December 14, 2012 is off the mark. (*See* Pl.'s Supp. Mem. at 22)(emphasis in original). Plaintiff's assertion ignores that the Appeals Council accepted some of her evidentiary submissions to be chronologically relevant,

even though these records were dated after the ALJ's decision.[8] (*See* Pl.'s Supp. Mem. at 22; Tr. 5-6, 515-18). The Appeals Council ordered the incorporation of this chronologically relevant evidence into the record, but subsequently determined that these medical records did not provide a basis for overturning the ALJ's decision. (*See* Pl.'s Supp. Mem. at 22; Tr. 5-6, 515-18).

Plaintiff raises two additional issues with respect to her new evidence argument: relevancy and materiality. New evidence is relevant if it relates to the period on or before the date of the ALJ's hearing. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 166 (11th Cir. 1994); 20 C.F.R. § 404.970(b). And, new evidence is material if there is a "reasonable possibility" that it would change the administrative outcome." *Flowers*, 441 F. App'x at 745 (quoting *Hyde v. Bowen*, 823 F.2d 456,459 (11th Cir. 1987)). If new evidence does not relate to the relevant time period, then it is not material. As demonstrated here, this is the basis upon which the Appeals Council decided that Plaintiff's additional submissions, dated January 2013 through February 2014, did not provide a basis for changing the ALJ's decision. (*See* Tr. 4-5; Supp. Tr. 519-684; Pl.'s Mo. to Supp. R., Ex. A). As noted below, the Appeals Council's analysis is correct.

Plaintiff asserts that her additional evidence, dated January 2013 through February 2014, is chronologically relevant. (*See* Pl.'s Am. Mem. 21-22). Plaintiff's argument in support of that assertion, however, is noticeably weak. Plaintiff summarizes the medical records submitted and occasionally cites case law without much, if any, analysis. In any event, after carefully reviewing Plaintiff's medical records from January 2013 through February 2014, this court finds that these records are chronologically irrelevant, immaterial, and cumulative.

---

[8] After reviewing Plaintiff's additional evidence, the Appeals Council accepted Plaintiff's records from C.E.D. Mental Health Center dated October 29, 2012 and from Quality of Life Services dated December 19, 2012 as chronologically relevant and incorporated these documents into the Record. (*See* Tr. 5-6, 508-18).

Plaintiff's records from St. Vincent's East, dated January 31, 2013 through February 5, 2013, do not relate to the relevant period of alleged disability. Approximately six weeks after the ALJ's decision, Plaintiff's records from St. Vincent's East, dated January 31, 2013 through February 5, 2013, indicate Plaintiff experienced an episode of depression with suicidal ideation. (Supp. Tr. 672). Upon intake, Plaintiff informed staff at St. Vincent's East that she had been suffering from this particularly severe episode for one month. (Supp. Tr. 669). Further, Plaintiff attributed her mental health's deterioration to the financial repercussions of her inability to receive disability, and claimed she was unable to provide food for her child. She indicated that life was not working out as she planned. (Supp. Tr. 590, 670). Because Plaintiff's worsening depression began after, and, actually, she says in response to, the ALJ's decision, it follows that it does not reflect the state of Plaintiff's mental impairments from the time of Plaintiff's alleged disability onset through the date of the ALJ's decision. Simply put, at the time Plaintiff presented to St. Vincent's East, her symptoms were a product of substantially different circumstances than those present at the time the ALJ issued his decision.

During Plaintiff's disability hearing, she testified that she had just moved out of her youngest-son's father's home and into her brother's home.  She claimed that according to a custody arrangement her eleven-year-old son would alternate spending four days at a time with her and then with his father. (Tr. 52-53) However, notes taken during Plaintiff's stay at St. Vincent's East indicate that she was no longer living with her brother and his roommate, and her living situation was temporary, at best. (Supp. Tr. 564-67). During intake, Plaintiff expressed that her deteriorating mental condition was due to her financial problems, beginning a month prior (after the denial of disability benefits), and culminating with her loss of custody of her eleven-year-old son due to her inadequate living conditions. (Supp. Tr. 564-67).

Aside from the substantial changes in circumstances, even were these records chronologically relevant, they are immaterial. Plaintiff's St. Vincent's inpatient medical records reflect several inconsistencies, and those inconsistencies call into question Plaintiff's credibility. Although Plaintiff was admitted to St. Vincent's for depression with suicidal ideation, her discharge summary from St. Vincent's suggests that during her stay Plaintiff was primarily concerned with the receipt of pain medication—she complained of its inability to manage her pain, despite receiving double her prescribed dosage. (Supp. Tr. 567). Additionally, within three months of Plaintiff's discharge from St. Vincent's East, Plaintiff's mental health records document Plaintiff's denials of experiencing suicidal ideation. (Pl.'s Mo. to Supp. R., Ex. A 6). Further, St. Vincent's inpatient records also note that Plaintiff reported noncompliance with her prescribed antidepressant treatment, and those records indicate that once treatment resumed Plaintiff showed enough improvement to be discharged and referred to outpatient therapy. (Supp. Tr. 567).  Lastly, although Plaintiff claims a major stressor is her loss of custodial rights over her eleven-year son "due to living conditions", at intake Plaintiff claimed to be living with her friend, Charles Huggins, since October 2012. (Supp. Tr. 589). During her hearing, Plaintiff testified that Charles "Charlie" Huggins was her eleven-year-old son's father and that custody of their son only becomes problematic when they do not live together in the same residence. (*See* Tr. 50, 53, 56). Plaintiff's own accounts of her deteriorating mental condition, inconsistency, and non-compliance demonstrate that there is not a reasonable possibility that her in-patient records from St. Vincent's East, dated January 31, 2013 through February 5, 2013, would have altered the ALJ's opinion; accordingly, these reports are not relevant or otherwise material.

Following her February 2013 discharge from St. Vincent's East, Plaintiff received counseling from C.E.D. Mental Health Services from February 2013 to October 2013. (Tr. 539-542, Pl.'s Mo. to Supp. R., Ex. A). C.E.D. medical records from the days following Plaintiff's discharge from St. Vincent's East indicate that despite continued depression, Plaintiff no longer presented with suicidal ideation, was compliant taking her prescription medications, and noticed improvement in her sleeping patterns. (Pl.'s Mo. to Supp. R., Ex. A 8, 10). However, those records also call into question her compliance with treatment. Although Plaintiff scheduled her next appointment on February 15, 2013 at 2:00pm, Plaintiff did not return for treatment again until April 1, 2013, almost two months later. (Pl.'s Mo. to Supp. R., Ex. A 8, 9, 12, 14-18).

To be sure, examination records from Plaintiff's April 2013 visit indicate a possible deterioration in Plaintiff's mental health. They describe Plaintiff as presenting with liable mood and unkempt hygiene, complaints of experiencing mood swings and nighttime depression since her last visit, and experiencing perceptual disturbances (auditory hallucinations) beginning two days prior. (Pl.'s Mo. to Supp. R., Ex. A 9, 12, 14-18). However, the records from Plaintiff's next therapy session, in May 2013, report significant improvement. At this session Plaintiff said she was experiencing continued depression (due to her depleted finances and lack of transportation) but denied having experienced any more hallucinations. (Pl.'s Mo. to Supp. R., Ex. A 3, 6, 9, 12, 14-18). Significantly, therapy records indicate that during that session Plaintiff engaged in constructive, forward-thinking dialogue with her therapist, actively participating in the development of her treatment plan. (Pl.'s Mo. to Supp. R., Ex. A 3, 6, 9, 12, 14-18). Specifically, Plaintiff identified her personal strengths which she thought would facilitate a positive mind-frame for her treatment and recovery, including her motivation to recover and cooking skills. (Pl.'s Mo. to Supp. R., Ex. A 2). Plaintiff also set one-year treatment goals that

included improved compliance with therapy, identification of depression triggers, and application of newly-learned coping techniques. (Pl.'s Mo. to Supp. R., Ex. A 3).

C.E.D. records from August 2013 also evidence Plaintiff's continued improvement.[9] (*See* Supp. Tr. 540). These records describe significant improvements in Plaintiff's home life and her general outlook and disposition; they also attribute some of Plaintiff's progress to her decision to leave her abusive ex-husband's home, and move in with a friend from church. (Supp. Tr. 540). Additionally, Plaintiff reported that she was staying busy cross-stitching, cleaning, and spending time at church, and this increase in activity had improved her sleeping patterns. (Supp. Tr. 540-41). Plaintiff also indicated she was successfully targeting her psychological triggers by "working on letting go what can't be changed." (Supp. Tr. 540). Plaintiff's C.E.D. Mental Health Center medical records from February 2013 through October 2013 show Plaintiff's continued improvement and increased functionality as Plaintiff actively participated in cognitive-behavioral therapy and remained compliant with her prescription medication. Accordingly these records are immaterial, because they support (rather than contradict) the ALJ's decision to deny disability benefits.

Lastly, Plaintiff's records from Quality of Life Health Center, dated February 2013 through February 2014, contain no more than cumulative evidence, and are therefore immaterial. Immediately following her discharge from St. Vincent's East, and approximately two months after the ALJ's decision, Plaintiff presented at Quality of Life for a follow-up examination for her depression and back pain. (Supp. Tr. 535-38, 534-55). At this follow-up Plaintiff reported that she was neither depressed nor anxious, was "moderate[ly]" active, and had just returned

---

[9] Although C.E.D. therapy records indicate that during her September 2013 session Plaintiff complained of worsening depression, Plaintiff never followed up on this complaint, and failed to appear for her October 2013 appointment. (Supp. Tr. 542). C.E.D. attempted to contact Plaintiff by letter to reschedule a follow-up appointment; however, the records provided do not indicate any affirmative response from Plaintiff. (*See* Supp. Tr. 542).

from Florida. (Supp. Tr. 544-45). After examination, Plaintiff's treating physician, Dr. Tariq, described Plaintiff as anxious with signs of anhedonia, but that she was oriented to time, place, person and situation. (Supp. Tr. 545). Records also indicated Plaintiff had a muscle spasm in her lumbar spine, but determined this spasm only "mildly reduced" her range of motion. (Supp. Tr. 545). Her April 2013 examination records indicated no physiological problems and described Plaintiff as appropriately oriented, with an intact memory. (Supp. Tr. 549). Plaintiff's July 2013 records and February 2014 records indicate largely the same findings, adding that Plaintiff was anxious, suffered from anhedonia, and had a muscle spasm in Plaintiff's lumbar spine.[10] (Supp. Tr. 537, 549, 554). Notably, these Quality of Life Health Center medical records do not provide any "new" evidence. Similarly, exam records from February 2013 through February 2014 provide no new diagnoses, propose no new treatment, and contain no objective medical evidence documenting a worsening of Plaintiff's previous physiological impairments. In fact, between February 2013 and February 2014, there were only three occasions where Plaintiff's treating physician, upon examination, found and documented a physiological discrepancy -- a muscle spasm -- that had, at most, only a small impact on Plaintiff's range of motion, and never impacted her strength.

In summary, Plaintiff's additional records which were submitted to the Appeals Council do not provide a basis for changing the ALJ's decision. At most, these records generally show that episodes of Plaintiff's psychological and physical deterioration occur after Plaintiff's noncompliance with either her prescription treatment, or her therapy, or a combination thereof. Further, Plaintiff's medical records repeatedly document positive responses from Plaintiff's

---

[10] Plaintiff submitted examination records from Quality of Life Health Center dated December 18, 2013. (*See* Supp. Tr. 519). These records document Plaintiff's annual obstetrics examination, and do not involve any of Plaintiff's alleged impairments. Accordingly, even if found to be chronologically relevant, this evidence is immaterial.

resumed compliance with prescription treatment and/or therapy. (Supp. Tr. 567). Medical records following Plaintiff's brief hospitalization document a conservative approach to treatment of her physical and psychological impairments. Notably, Plaintiff admitted her depression worsened after learning she was denied SSI and DIB, and on many occasions Plaintiff blames her financial situation brought on by the denial of benefits for her depression. With respect to Plaintiff's physiological pain complaints, the additional evidence provided is merely cumulative of evidence considered by the ALJ. Plaintiff's examination results provided no new diagnoses, nor did they contain new objective medical evidence documenting any worsening of Plaintiff's previous physiological impairments. In fact, between February 2013 and February 2014, there were only two occasions when Plaintiff's treating physician, upon examination, found and documented a physiological discrepancy -- a muscle spasm -- and that had, at most, only a small impact on Plaintiff's range of motion, and no impact on her relative strength.

After a thorough consideration of all the evidence provided, the court finds that substantial evidence supports the ALJ's decision even when Plaintiff's additional evidence is considered. The submissions rejected by the Appeals Council were not chronologically relevant, material, or even "new." Accordingly, the Appeals Council's rejection of Plaintiff's submissions from St. Vincent's East, C.E.D. Mental Health Center, and Quality of Life Health Complex was proper.

### B.   The ALJ Properly Developed the Record and his Determination of Plaintiff's RFC is Supported by Substantial Evidence

Plaintiff next argues that the ALJ's determination was not supported by substantial evidence of record, because it was not based on a physician's opinion. (*See* Pl's Amend. Br. at 27). However, Plaintiff's argument is without merit.

Assessing Plaintiff's RFC is the responsibility of the Commissioner. To confer this responsibility on a doctor at the hearing level would be contrary to the Act, the implementing regulations, case law, and Social Security Ruling ("SSR") 96-5p. *See Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010)("task of determining a claimant's [RFC] and ability to work is within the province of the ALJ, not of doctors"); *see also Castle v. Colvin*, 557 Fed. App'x 849, 854 (11th Cir. 2014)(determining that there is no requirement that an RFC determination must be underpinned by a medical source opinion); *Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 923 (11th Cir. 2007)(rejecting argument that once the ALJ rejected treating physician's medical source statement, the record lacked substantial evidence to support the ALJ's RFC assessment for light work; finding instead that substantial evidence, including treatment records, remained in the record to support the ALJ's RFC assessment). Because the determination of RFC "direct[s] the determination or decision of disability," it is not a medical finding; rather, it is an administrative finding on an issue reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-5p, 1996 WL 374183, at *2 (S.S.A.). Under the Act, the Commissioner is responsible for deciding whether a claimant is disabled, and at the hearing level, this responsibility is reserved for the ALJ. *See* 42 U.S.C. § 405(a)-(b)(1); 20 C.F.R. §§ 404.929, 404.944, 404.946, 404.953, 416.1429, 416.1444, 416.1446, 416.1453, 416.1445. Moreover, the regulations express that the final responsibility for determining RFC rests with the ALJ based upon all the evidence in the record, not only the relevant medical evidence. *See* 20 C.F.R §§ 404.1527(e)(2), 404.1545(a)(3), 404.1546(c), 416.927(e)(2), 416.945(a)(3), 416.946(c); SSR 96-5p, 1996 WL 374183, at *5.

Because an RFC assessment is often the determining factor in deciding a disability claim, requiring the ALJ to base his finding on a physician's opinion would improperly confer the

authority to make a disability determination to the doctor, and would essentially abdicate the Commissioner's statutory responsibility to determine a claimant's disability. *See* SSR 96-5p, 1996 WL 374183, at *2. Further, SSR 96-5p clarifies that a physician's opinion regarding a claimant's abilities is different from the ALJ's assessment of a claimant's RFC. SSR 96-5p, 1996 WL 374183, at *4 ("Even though the adjudicator's RFC assessment may adopt the opinions in a medical source statement, they are not the same thing: A medical source statement is evidence that is submitted to [the Commissioner] by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicators ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)"); *see also* 65 Fed. Reg. 11,866, 11,869 (Mar. 7 2000); 56 Fed. Reg. 36,932, 36,934 (Aug 1, 1991)(deleting all references to an RFC as a "medical assessment").

Here, the ALJ properly considered all the evidence of record, and his assessment of Plaintiff's RFC is supported by substantial evidence. Moreover, the ALJ did not ignore Plaintiff's medical records as Plaintiff suggests. Rather, the ALJ appropriately relied on Plaintiff's objective medical evidence of record when assessing Plaintiff's RFC. The ALJ looked to the nature and type of treatment Plaintiff received when determining Plaintiff's credibility with respect to subjective complaints. The ALJ reasoned that Plaintiff's medical treatment was "essentially routine and conservative in nature," and was not the type of medical treatment expected for a totally disabled individual. (Tr. 28). The ALJ later explained, that moderate symptoms, as indicated by Plaintiff's previous GAF scores of 53 and 55, were consistent with her treatment records, as they were supported by Plaintiff's use of a primary-care physician to treat her depression. (Tr. 29, 58-59, 237, 404, 406, 408, 462).

Further, the ALJ explained his reasons for assigning such little weight to the subjective medical opinions. For example, as the ALJ explained, the opinions of Dr. Teschner, Plaintiff's treating physician, are due to be discounted because they were conclusory and "wildly inconsistent with her limited outpatient treatment notes, the diagnostic imaging she ordered, and [Plaintiff's] purported daily activities." (Tr. 29, 475-76, 505-507). Further, the ALJ found the opinions of Dr. Prince, an examining physician, did not merit weight because they were inconsistent with Plaintiff's treatment records, and also outside of Dr. Prince's area of medical expertise. (Tr. 30, 488-92). The ALJ also concluded that the opinions of both Dr. Prince and Dr. Wilson were not due great deference because they are the product of Plaintiff's efforts to generate evidence for her current appeal.  (Tr. 30).

For these reasons, the court finds that the ALJ's determination of Plaintiff's RFC is the product of a full and fairly developed record, and also is supported by substantial evidence. (*See* Tr. 26).

### C.      The ALJ Properly Evaluated the Opinion of Dr. David Wilson[11]

Plaintiff contends that the ALJ improperly rejected the opinion of Dr. Wilson and, in doing so, the ALJ substituted his own opinion. (*See* Pl.'s Amend. Br. 34). The court disagrees and, for the reasons noted below, finds that the ALJ's decision affording little weight to Dr. Wilson's opinion is proper and supported by substantial evidence.

When determining the weight to give a physician's opinion, an ALJ considers numerous factors, including whether the physician examined the claimant, whether the physician treated

---

[11] Plaintiff only challenges the weight given by the ALJ to Dr. Wilson's opinions, and notably does not challenge the weight afforded to the opinions of Dr. Teschner and Dr. Prince. To the extent Plaintiff intended to challenge the ALJ's treatment of the opinions of Dr. Teschner and Dr. Prince, her argument is waived. *See N.L.R.B. v. McClain of Georgia, Inc.*, 138 F. 3d 1418, 1422 (11th Cir. 1998)("Issues raised in a perfunctory manner, without supporting arguments and citations to authorities, are generally deemed to be waived.").  But, for the reasons already noted, such an argument would necessarily fail even if it had not been waived.

the claimant, the evidence presented by the physician in support of his or her opinion, whether the physician's opinion is consistent with the record as a whole, and the physician's specialty. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, a treating physician's opinion is entitled more weight; indeed, an ALJ must provide good reasons for discounting a treating physician's opinion. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2001). An ALJ may discount a physician's opinion, including that of a treating physician, when the opinion is conclusory, the physician fails to provide objective medical evidence to support his or her opinion, the opinion is inconsistent with the record as a whole, or the evidence otherwise supports a contrary finding. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Crawford*, 363 F.3d at 1159-60; *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). An opinion from a non-treating physician is not entitled to any special deference or consideration. *See* 20 C.F.R. §§ 404.1502, 404.1527(c)(2), 416.902, 416.927(c)(2); *Crawford v. Comm'r of Soc. Sec.*, 363 F3d 1155, 1160 (11th Cir. 2004); *see also Denomme v. Comm'r Soc. Sec. Admin.*, 518 F. App'x 875, 877 (11th Cir. 2013)(holding the ALJ does not have to defer to opinion of doctor who conducted single examination and who was not a treating doctor).

Additionally, as noted previously, opinions on some issues, including whether a claimant is able to work, a claimant's RFC, and the application of vocational factors, "are not medical opinions, … but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R. §§ 404.1527(d), 416.927(d); *see* SSR 66-5p; *Denomme*, 518 F. App'x at 878; *Hutchinson v. Astrue*, 408 F. App'x 324, 327 (11th Cir. 2011); *Bell v. Bowen*, 796 F.2d 1350, 1353-54 (11th Cir. 1986). Opinions on issues reserved for the Commissioner, even when offered by a treating source, are not entitled to controlling weight nor are they given special significance. SSR 96-5p. To give such opinions "controlling

weight would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Id.* Therefore, although relevant, physician's opinions as to a claimant's abilities or restrictions are not determinative, because they are within the sole province of the ALJ when assessing a claimant's RFC. *See* 20 C.F.R. §§ 404.1512(b)(2), 404.1513(b)(6), 404.1527(d)(2), 404.1545(a)(3), 404.1546(c), 416.912(b)(2), 416.913(b)(6), 416.927(d)(2), 416.945(a)(3), 416.946(c); SSR 96-5p; *see also Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 486 (11th Cir. 2012)("A claimant's [RFC] is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive").

In the present case, the ALJ considered Dr. Wilson's opinion in light of the evidence of record. The ALJ noted that, at the request of her attorney and in anticipation of Plaintiff's disability hearing, Plaintiff submitted to a psychological evaluation by Dr. David Wilson in March 2012. (Tr. 28, 462-66). The ALJ noted that during this evaluation, Plaintiff was able to count down from twenty without error, perform serial 3's to twenty-seven without error, and count down from one-hundred in increments of seven until reaching sixty-five without error. (Tr. 28, 465). The ALJ noted that Dr. Wilson assessed Plaintiff as having good mental control, attention, and concentration during the exam. (Tr. 28, 465). Dr. Wilson's records also indicate that Plaintiff reported leaving her job due to physical problems, not mental problems, stating: "physically I am not able and I don't have much education or any kind of training." (Tr. 464). Dr. Wilson diagnosed Plaintiff with low-average to borderline intelligence. (Tr. 28, 466). The ALJ also noted that, during the evaluation, Plaintiff reported experiencing anxiety on a regular basis, that she had both good and bad days, and denied suicidal ideation. (Tr. 28, 465). While

finding Plaintiff's judgment and insight fair, Dr. Wilson concluded Plaintiff had major depressive disorder, recurrent type, and assigned a global assessment of functioning (GAF) score of 50.[12] (Tr. 28, 466). The ALJ further noted that Dr. Wilson opined Plaintiff's depression and anxiety caused her significant problems and that he concluded Plaintiff would have major difficulties in a work environment. (Tr. 28, 466).

The ALJ afforded Dr. Wilson's opinion little weight in. (Tr. 29, 466, 473-74). In support of the ALJ's decision to place little stock in Dr. Wilson's opinion, the ALJ pointed to several inconsistencies therein. (Tr. 28-29). *See* 20 C.F.R §§ 404.1527(d)(4), 416.927(d)(2)("Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion."). The ALJ noted that Dr. Wilson opined that Plaintiff's anxiety, like her depression, would cause significant problems, but emphasized that Dr. Wilson never diagnosed Plaintiff as suffering from an anxiety disorder. (Tr. 29, 466). The ALJ placed special emphasis on the fact that Plaintiff underwent the examination with Dr. Wilson not in an attempt to seek treatment for symptoms, but rather, in connection with her effort to generate evidence for her disability application. (Tr. 29, 462). *See* 20 C.F.R. §§ 404.1502, 416.902 (noting that the Commissioner will not consider as an acceptable medical source a claimant's treating source when a claimant's relationship with that source is not based on his or her medical need for treatment or evaluation, but on his or her need to obtain a report to further their claim for disability). After weighing the record evidence as a whole, and finding that Dr. Wilson's opinion was contradicted by it, the ALJ discounted Dr. Wilson's opinions.  That determination is supported by substantial evidence.

---

[12] The ALJ mistakenly found that a GAF score of 50 represented moderate symptoms. (Tr. 28). A GAF score of 50 actually is at the top of the range indicating serious symptoms. *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 34 (4th ed. 2000).

Further, Plaintiff's assertion that the ALJ substituted his opinion for that of Dr. Wilson is baseless. An ALJ does not assume the role of a doctor when assessing a claimant's RFC.  Here, the ALJ was not required to base his RFC finding on a physician's opinion. *See Castle v. Colvin*, 557 F. App'x 849, 853-84 (11th Cir. 2014)("the ALJ did not 'play doctor' in assessing Mr. Castle's RFC, but instead properly carried out his regulatory role as an adjudicator responsible for assessing Mr. Castle's RFC").

Plaintiff may disagree with the ALJ's final decision as to her capabilities and limitations. But the ALJ is the fact-finder and the ALJ alone has the duty to weigh the evidence of record. *See Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996). In order to fulfill his responsibility as fact finder, the ALJ must "examine the evidence and resolve the conflicting reports." *Id.* at 1079 (citing *Powers v. Heckler*, 738 F.2d 1151, 1152 (11th Cir. 1984)(per curium)). For these reasons, the court concludes that the ALJ properly determined Plaintiff's RFC and this determination is supported by substantial evidence.

### D.       The ALJ's Misstatement Plaintiff's GAF Score is Harmless Error

Finally, Plaintiff argues that the ALJ relied on a misstatement of Plaintiff's GAF score, assigned by Dr. Wilson, when determining Plaintiff's RFC, and that this reliance results in reversible error. But that argument is off target.  Under the circumstances of this case, the court finds the ALJ's misstatement to be a harmless error.

In an unpublished decision, the Eleventh Circuit previously determined that remand of a social security appeal was appropriate where the "ALJ erroneously described [a] claimant's GAF score of forty-five to be 'reflective of moderate symptoms' when in fact a GAF score of forty-five "indicates severe impairment." *McCloud v. Barnhart*, 166 Fed. App'x 410, 418 (11th Cir. 2006). But there was more involved in the *McCloud* decision than just that.  In *McCloud*, the

ALJ failed to state what weight was afforded to the misstated GAF score of 45, and failure to provide an explanation as to why other GAF scores were ignored (that indicated severe impairment) was error. *Id* at 418-20.

Here, the ALJ misstated the meaning of a GAF score assigned by Dr. Wilson.[13] *See id.* (Tr. 29) However, upon careful consideration, the court finds the circumstances of this case are distinguishable from those in *McCloud*. While *McCloud*'s ALJ failed to indicate how much weight was given to the misstated GAF score, here, the ALJ's misstatement appears within his explanation of his decision to afford little weight to Dr. Wilson's examining opinions. (Tr. 28). As this court determined above, the ALJ adequately explained his decision to afford little weight to Dr. Wilson's opinions, and this decision is supported by substantial evidence. (*See.* Tr. 28-29).

Additionally, the court notes Plaintiff does not contend, nor does the evidence suggest, the ALJ's decision ignored other GAF scores in the severe range. *Cf. McCloud*, 166 Fed. App'x at 418. In fact, after misstating the meaning of Plaintiff's GAF score, the ALJ noted that Dr. Wilson opined Plaintiff's depression and anxiety caused her significant problems and that he concluded Plaintiff would have major difficulties in a work environment. (Tr. 29, 462, 466). Importantly, Dr. Wilson's examination records indicate that he was aware of the moderate GAF scores of 53 and 55 assigned by Plaintiff's treating psychologist, when he assigned a contradictory GAF score, but provided no reason for discounting these moderate GAF assignments. (Tr. 404, 405, 408, 462). The ALJ refuted Dr. Wilson's findings, explaining that the evidence of record supported moderate GAF scores. (Tr. 29). The ALJ further explained Dr. Wilson's opinions were inconsistent with Plaintiff's conservative prescription therapy provided by her primary care physician. (*See* Tr. 29, 58-59, 237, 404, 405, 408, 462). Lastly, the ALJ

---

[13] The ALJ incorrectly stated that a GAF score of 50 represented moderate symptoms, when, in fact, a GAF score of 50 is the upper threshold for serious symptoms. *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 34 (4th ed. 2000).)

emphasized that Dr. Wilson's opinions are undermined due to the fact that (again) Plaintiff sought his examination, not for treatment purposes, but rather, in an effort to generate additional evidence for her disability application. (Tr. 29, 462). Because the court has determined that the ALJ properly evaluated the medical evidence of record, and because substantial evidence supports his weighing of Dr. Wilson's opinions, the court concludes that the ALJ's misstatement of Plaintiff's GAF score was immaterial, as its correction would not have affected the ALJ's decision. Accordingly, the ALJ's error was harmless and does not warrant reversal or remand.

**V.     Conclusion**

After careful review, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence, and that the ALJ applied the proper legal standards in reaching this determination. The Commissioner's final decision is, therefore, due to be affirmed.  A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this March 10, 2016.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE